IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-75

No. 343A20

Filed 18 June 2021

IN THE MATTER OF: M.S., W.S., E.S.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 2 April 2020 by Judge Marion Boone in District Court, Stokes County. This matter was calendared for argument in the Supreme Court on 22 April 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Jennifer Oakley Michaud for petitioner-appellee Stokes County Department of Social Services.*

*James N. Freeman Jr. for appellee Guardian ad Litem.*

*Anné C. Wright for respondent-appellant mother.*

*Christopher M. Watford for respondent-appellant father of M.S. and W.S.*

*Edward Eldred for respondent-appellant father of E.S.*

BERGER, Justice.

¶ 1    Respondent-mother appeals from the trial court's orders terminating her parental rights to M.S. (Molly), W.S. (Will), and E.S. (Ella).[1] Counsel for respondent-mother has filed a no-merit brief under Rule 3.1(e) of the North Carolina Rules of

---

[1] Pseudonyms are used in this opinion to protect the juveniles' identities and for ease of reading.

Appellate Procedure. We conclude the issues identified by counsel as arguably supporting the appeal are meritless and, therefore, affirm the trial court's orders as to respondent-mother.

Respondent-father Cameron appeals from the trial court's orders terminating his parental rights to Molly and Will. Respondent-father Miles appeals from the trial court's orders terminating his parental rights to Ella. We conclude that the trial court made sufficient findings of fact, supported by clear, cogent, and convincing evidence, to support its conclusion to terminate both respondent-fathers' parental rights under N.C.G.S. § 7B-1111(a)(2); therefore, we affirm the trial court's orders as to both respondent-fathers.

## I.    Background

On July 5, 2018, the Stokes County Department of Social Services (DSS) received a report alleging that respondent-mother, respondent-father Cameron, Molly, and Will were overnight guests at a home when officers with the King Police Department responded to a report of drug use. After obtaining a search warrant, officers found evidence of drug use, including methamphetamine and marijuana; drug paraphernalia, including hypodermic needles; and an unsecured, loaded gun, all of which were accessible to the children. Respondent-mother denied seeing any drugs or drug paraphernalia in the home and denied intravenous drug use; however, an officer noted that she appeared to have fresh track marks on her arms and hands.

The children were then placed with a temporary safety provider that same day.

¶ 4        On July 6, 2018, respondent-mother was arrested and charged with possession of heroin, possession of drug paraphernalia, and child abuse. These charges were later dismissed. Respondent-father Cameron was also arrested and charged with a felony probation violation and resisting a public officer. Both parents refused to submit to a drug screen requested by DSS.

¶ 5        On July 13, 2018, DSS filed juvenile petitions alleging that Molly and Will were neglected juveniles due to the children living in an environment injurious to their welfare, and DSS obtained nonsecure custody of the children the same day.

¶ 6        On July 24, 2018, respondent-mother entered into an Out of Home Family Services Agreement Case Plan with DSS.

¶ 7        On August 20, 2018, respondent-mother gave birth to Ella. Both respondent-mother and Ella tested negative for controlled substances at the hospital; however, on August 27, 2018, a test of Ella's umbilical cord came back positive for Suboxone.

¶ 8        On August 22, 2018, DSS received a report of substance abuse and an injurious environment, which alleged that respondent-mother did not have a home to take Ella to following their discharge from the hospital. Respondent-mother obtained a placement at The Shepherd's House in Mount Airy. On August 28, 2018, respondent-mother and Ella were discharged from the hospital and moved to The Shepherd's House.

¶ 9        On September 13, 2018, DSS reported that respondent-mother had made no progress on most of the requirements of her case plan, except she "has had clean drug screens since the children were placed in [the] custody of DSS." In addition, respondent-mother was participating in parenting classes, which was in compliance with her case plan, while living at The Shepherd's House. On or about October 4, 2018, respondent-mother's progress stalled. She admitted to taking Suboxone on several occasions, and DSS learned respondent-mother was spending significant time with respondent-father Cameron, though she refused to provide his contact information to DSS. On October 5, 2018, DSS filed a juvenile petition alleging Ella was neglected due to her living in an environment injurious to her welfare. DSS obtained nonsecure custody of Ella that same day.

¶ 10        On September 13, 2018, an adjudication hearing was held for Molly and Will. Respondent-mother consented that Molly and Will were neglected juveniles based on the allegations contained in the July 13, 2018 juvenile petitions. Respondent-father Cameron did not attend the hearing. On October 29, 2018, the trial court entered an order adjudicating Molly and Will to be neglected juveniles. In an order entered after a subsequent disposition hearing, the trial court set the primary permanent plan as reunification, with a concurrent plan of guardianship with a court-approved individual. Respondent-mother was ordered to comply with her case plan and was allowed two hours of supervised visitation per week. Respondent-father Cameron

was ordered to enter into a case plan and cooperate with DNA paternity testing. He was denied visitation "due to his lack of contact with DSS and engagement with the case." Subsequent DNA testing established respondent-father Cameron to be the father of Molly and Will.

¶ 11        At a December 6, 2018, adjudication hearing, respondent-mother consented that Ella was a neglected juvenile based on the allegations contained in the October 5, 2018 juvenile petition. Respondent-father Miles had been determined to be Ella's biological father through DNA testing, and he was present at the hearing. On January 16, 2019, the trial court entered an order adjudicating Ella to be a neglected juvenile. In the accompanying disposition order, the trial court set the primary permanent plan as reunification, with a concurrent plan of guardianship with a court-approved individual. Respondent-mother was ordered to comply with her case plan and was allowed two hours of supervised visitation per week with Ella as well as two additional hours per week during respondent-mother's visitations with Molly and Will. Respondent-father Miles was ordered to enter into a case plan and was allowed two hours of supervised visitation per week.

¶ 12        Subsequent reports compiled by DSS and the guardian ad litem reflect the lack of progress made by any of the parents. Respondent-mother reported continued use of unprescribed Suboxone, marijuana, and methamphetamines, resulting in several positive drug screens. She also refused at least three requested drug screens. While

she reported to the social worker that she had completed various assessments as required by her case plan, she did not comply with any of the recommendations from the assessments. She also refused to cooperate when told not to use inappropriate language, not to bring inappropriate food, not to discuss the facts of the case with and in front of the children, and not to tell them they would be coming home after the next hearing.

¶ 13        Respondent-father Cameron was incarcerated at the Franklin Correctional Center in November 2018 and was released on May 1, 2019. He requested visitation with Molly and Will, though he only attended two out of five possible scheduled visits. He never entered into a case plan with DSS. He did not stay in consistent contact with DSS after being released from custody and did not provide DSS with his contact information. On July 1, 2019, respondent-father Cameron was arrested and was in custody in the Surry County Jail with multiple pending felony drug charges.

¶ 14        On December 12, 2018, respondent-father Miles entered into a case plan and was attending visitations with Ella until he was incarcerated on April 10, 2019. He was released on May 27, 2019, but he was rearrested three days later and confined in the Stokes County Jail. Prior to his incarceration, he was not engaged with DSS and did not make any progress towards his case plan. While he still needed to complete parenting classes and mental health and substance abuse assessments, DSS noted that he was not able to satisfy those requirements of his case plan while

he was in jail. Subsequent testimony from a DSS social worker established that respondent-father Miles had access to resources to assist with the completion of his case plan while incarcerated, but he had only availed himself of GED classes and not Narcotics Anonymous meetings, parenting classes, or cognitive behavioral intervention.

On September 10, 2019, the primary permanent plan for all of the children was changed to adoption, with a concurrent plan of reunification, as a result of the lack of progress by each of the parents. On November 7, 2019, DSS filed motions to terminate the parental rights of all three parents. The motions alleged there were grounds to terminate each parent's parental rights to their respective children pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (6).

Following a hearing, the trial court entered orders on April 2, 2020, in which it determined grounds existed to terminate the parental rights of all parents for the grounds alleged in the motions. The trial court also determined it was in the children's best interests that respondent-parents' rights be terminated. Respondent-parents appeal.

## II. Respondent-Mother's No-Merit Appeal

Respondent-mother's counsel filed a no-merit brief pursuant to Rule 3.1(e) of the North Carolina Rules of Appellate Procedure. Counsel has advised respondent-mother of her right to file a pro se brief on her own behalf with this Court and has

provided respondent-mother with the documents necessary to do so. Respondent-mother has not submitted any written arguments.

Respondent-mother's counsel identified three issues that could arguably support an appeal but stated why she believed each of these issues lacked merit. We independently review these issues contained in respondent-mother's no-merit brief filed pursuant to Rule 3.1(e). *In re L.E.M.*, 372 N.C. 396, 402, 831 S.E.2d 341, 345 (2019). Based upon our careful review of the issues identified in the no-merit brief, we are satisfied that the trial court's April 2, 2020 orders were supported by competent evidence and based on proper legal grounds. Accordingly, we affirm the trial court's orders terminating respondent-mother's parental rights.

### III. Respondent-Fathers' Appeals

Both respondent-fathers argue that the trial court erred by concluding that grounds existed to terminate their parental rights in their respective children.

A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, 7B-1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(f). We review a trial court's adjudication that grounds exist to terminate parental rights to determine "whether the trial court's findings of fact are

supported by clear, cogent, and convincing evidence and whether those findings support the trial court's conclusions of law." *In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019). Findings of fact that are supported by clear, cogent, and convincing evidence are "deemed conclusive even if the record contains evidence that would support a contrary finding." *Id.* Unchallenged findings of fact are binding on appeal. *In re D.W.P.*, 373 N.C. 327, 330, 838 S.E.2d 396, 400 (2020).

¶ 21 Here, both respondent-fathers' parental rights were terminated under N.C.G.S. § 7B-1111(a)(1), (2), and (6). "However, an adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order." *In re J.S.*, 374 N.C. 811, 815, 845 S.E.2d 66, 71 (2020). Therefore, we will only review respondent-fathers' challenges to termination pursuant to N.C.G.S. § 7B-1111(a)(2) and will not review either of the respondent-fathers' challenges to grounds for termination pursuant to N.C.G.S. § 7B-1111(a)(1) or (6).

¶ 22 Pursuant to N.C.G.S. § 7B-1111(a)(2), a trial court may terminate parental rights if "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2) (2019). Because Molly and Will were in the custody of DSS for approximately twenty months

prior to the termination hearing, and Ella for approximately seventeen months, we address each of respondent-fathers' arguments below and conclude that neither respondent-father made a sufficient showing that he made reasonable progress under the circumstances to correct the conditions which led to the children's removal.

**A. Respondent-Father Cameron**

¶ 23     Respondent-father Cameron argues the trial court failed to establish both that he willfully left Molly and Will in foster care and that he failed to make reasonable progress under the circumstances. We disagree.

¶ 24     "[A] finding that a parent acted 'willfully' for purposes of N.C.G.S. § 7B-1111(a)(2) 'does not require a showing of fault by the parent.'" *In re J.S.*, 374 N.C. at 815, 845 S.E.2d at 71 (quoting *In re Oghenekevebe*, 123 N.C. App. 434, 439, 473 S.E.2d 393, 398 (1996)). "Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort." *In re S.M.*, 375 N.C. 673, 685, 850 S.E.2d 292, 303 (2020) (quoting *In re McMillon*, 143 N.C. App. 402, 410, 546 S.E.2d 169, 175, *disc. review denied*, 354 N.C. 218, 554 S.E.2d 341 (2001)).

¶ 25     Here, respondent-father Cameron never entered into a case plan with DSS. Had he done so, the goals he needed to achieve prior to reunification would have included: (1) to demonstrate appropriate parenting skills; (2) "to effectively manage mental health symptoms, including treatment for substance abuse"; (3) "to address

the child[ren]'s basic needs with income security"; and (4) "[t]o obtain and maintain safe and stable housing[ and] transportation." There is no indication respondent-father Cameron took any steps toward remediating the conditions which led to the removal of Molly and Will, namely their exposure to an unsafe environment due to the substance abuse occurring in the home. In fact, respondent-father Cameron's most recent incarceration stemmed from several felony drug charges.

¶ 26 Moreover, respondent-father Cameron does not challenge finding of fact 23—that he never entered into a case plan; findings of fact 26 and 30—that he was not incarcerated for nine of the approximate twenty months Molly and Will were in DSS custody, including the first four months after they were removed from the home; finding of fact 27—that he requested one visit following his release from jail in May 2019 but failed to contact DSS after the visit concerning its request to set up a meeting to establish a case plan; and finding of fact 29—that after his incarceration in February 2020, he wrote a letter to DSS indicating that he would "do things once he went to prison." These unchallenged findings support the trial court's conclusion that respondent-father Cameron "willfully left [Molly and Will] in foster care . . . for more than 12 months without showing" reasonable progress to correct the conditions that led to their removal.

¶ 27 "[A] trial court has ample authority to determine that a parent's 'extremely limited progress' in correcting the conditions leading to removal adequately supports

a determination that a parent's parental rights in a particular child are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2)[.]" *In re B.O.A.*, 372 N.C. at 385, 831 S.E.2d at 314. In this case, respondent-father Cameron cannot point to even "extremely limited progress" as he failed to even take the first step, entering into a case plan, even though he was presented with several opportunities to do so. Accordingly, we conclude the trial court did not err in determining grounds existed to terminate respondent-father Cameron's parental rights under N.C.G.S. § 7B-1111(a)(2).

**B. Respondent-Father Miles**

Respondent-father Miles argues the only condition relating to him that led to Ella's removal from the home was that his paternity was not established at the time of removal. Thus, he argues that after his paternity was established by a DNA test, he fulfilled the reasonable progress standard by correcting the only condition that led to Ella's removal from his custody. We disagree.

> [A]s long as a particular case plan provision addresses an issue that, directly or indirectly, contributed to causing the juvenile's removal from the parental home, the extent to which a parent has reasonably complied with that case plan provision is, at minimum, relevant to the determination of whether that parent's parental rights in his or her child are subject to termination for failure to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2).

*In re B.O.A.*, 372 N.C. at 385, 831 S.E.2d at 314.

¶ 29        In *In re B.O.A.*, the child was placed into DSS custody as a result of a domestic violence incident and an unexplained bruise on the child's arm. *Id.* at 385–86, 831 S.E.2d at 314. Throughout subsequent orders, starting with the initial adjudication order, the trial court identified "a complex series of interrelated factors [that] contributed to causing the conditions that led to [the child's] removal from [the respondent's] home." *Id.* at 386, 831 S.E.2d at 315. The respondent was receiving treatment for anxiety and depression, had a previous diagnosis of post-traumatic stress disorder, and was receiving treatment for substance abuse. *Id.* This Court acknowledged that post-traumatic stress disorder can result from domestic violence and untreated mental health disorders and substance abuse can make an individual more susceptible to domestic violence; therefore, "the history shown in the[ ] reports and orders reveals the existence of a sufficient nexus between the conditions that led to [the child's] removal from [the respondent's] home and the provisions of the court-ordered case plan relating to [the respondent's] mental health issues, substance abuse treatment, and medication management problems." *Id.* at 386–87, 831 S.E.2d at 315.

¶ 30        Similarly, the respondent in *In re C.J.* argued that the only condition that led to her child's removal was her "potential lengthy incarceration in Mississippi," which she argued was remedied at the time of the termination hearing. *In re C.J.*, 373 N.C. 260, 262–63, 837 S.E.2d 859, 861 (2020). However, the record revealed the

respondent's pending criminal charges were for drug-trafficking and stolen weapons; she had an open case in another state involving allegations that she used the child to obtain prescription medication; she had a history of involvement with Child Protective Services in Mississippi related to allegations of inappropriate care, sexual abuse, exposure of a child to illegal substances, and inappropriate discipline; and her demeanor at hearings led the trial court to believe she may have been under the influence of substances and suffering from a mental health condition. *Id.* at 263, 837 S.E.2d at 861. This Court determined that "[t]hese findings establish[ed] the required nexus between the components of [the respondent's] court-approved case plan"— which required her to complete an assessment and follow all recommended treatment for substance abuse issues, submit to requested drug screens, and obtain and maintain stable employment and housing —"and the overall conditions that led to [the child's] removal." *Id.*

¶ 31 In this case, Ella was taken into DSS custody due to allegations of neglect stemming, in part, from concerns about her exposure to substance abuse. While respondent-father Miles may not have been involved in the removal of Ella from respondent-mother's care, the conditions that led to Ella's removal were appropriately considered by the trial court in addressing the requirements present in respondent-father Miles's case plan. *See In re B.O.A.*, 372 N.C. at 381, 831 S.E.2d at 311–12 ("According to N.C.G.S. § 7B-904(d1)(3), a trial judge has the authority to

require the parent of a juvenile who has been adjudicated to be abused, neglected, or dependent to take appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication or to the court's decision to remove custody of the juvenile from the parent, guardian, custodian, or caretaker." (cleaned up) (quoting N.C.G.S. § 7B-904(d1)(3) (2017))).

¶ 32        Respondent-father Miles's case plan required him to (1) complete parenting classes, (2) complete substance abuse and mental health assessments and follow all recommendations, (3) obtain secure income, and (4) obtain and maintain safe and stable housing and transportation. Respondent-father Miles does not challenge any of the trial court's findings of fact, which establish that he (1) failed to complete parenting classes; (2) failed to obtain the appropriate assessments; (3) tested positive for marijuana, methamphetamines, and amphetamines; and (4) refused at least four requested drug screens. The trial court also made unchallenged findings that respondent-father Miles was incarcerated several times while Ella was in DSS custody, that he was not incarcerated for seven months while Ella was in DSS custody, and that he failed to complete any programs while incarcerated that would show progress toward the completion of his case plan.

¶ 33        In fact, respondent-father Miles's unmanaged issues with substance abuse presents a sufficient nexus between the conditions that led to Ella's removal and the substance abuse and mental health components of his case plan. *See In re B.O.A.*,

372 N.C. at 387, 831 S.E.2d at 315. Moreover, the requirements related to income and housing may also relate to the issues involving respondent-father Miles's untreated substance abuse. *See id.* Accordingly, the trial court's unchallenged findings support its conclusion that respondent-father Miles failed to make reasonable progress to correct the conditions that led to Ella's removal. Therefore, we conclude the trial court did not err in determining grounds existed to terminate respondent-father Miles's parental rights under N.C.G.S. § 7B-1111(a)(2).

## IV. Conclusion

We conclude respondent-mother failed to present any arguments of merit on appeal. Additionally, we conclude the trial court's findings of fact support its conclusion that grounds existed to terminate the parental rights of both respondent-father Cameron and respondent-father Miles under N.C.G.S § 7B-1111(a)(2). Given that the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, *see In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019), we need not review either of respondent-fathers' challenges to the grounds for termination pursuant to N.C.G.S. § 7B-1111(a)(1) and (6). As neither respondent-father has challenged the trial court's best interest determination, we affirm the trial court's termination orders.

AFFIRMED.